1 | NICOLAS MORGAN (Bar No. 166441)
nicolas.morgan@dlapiper.com
2 | JOSHUA BRIONES (Bar No. 205293)
joshua.briones@dlapiper.com
3 | ANA TAGVORYAN (Bar No. 246536)
ana.tagvoryan@dlapiper.com
4 | **DLA PIPER LLP (US)**
1999 Avenue of the Stars, Suite 400
5 | Los Angeles, CA 90067-6022
Tel: 310.595.3000
6 | Fax: 310.595.3300

7 | Attorneys for Receiver Robert P. Mosier

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

ROBERT P. MOSIER, Receiver for
PRIVATE EQUITY
MANAGEMENT GROUP, LLC and
PRIVATE EQUITY
MANAGEMENT GROUP, INC.,

                   Plaintiff,

          v.

ANTHONY BUFINSKY; and DOES
1-5, inclusive,

                   Defendants.

Case No. **SACV11-00274 CJC (RN**

**COMPLAINT FOR:**

**(1) BREACH OF FIDUCIARY DUTY;**

**(2) CONVERSION AND CONSPIRACY TO CONVERT;**

**(3) GROSS NEGLIGENCE;**

**(4) PROFESSIONAL NEGLIGENCE;**

**(5) WASTE OF ASSETS; AND**

**(6) UNJUST ENRICHMENT**

VIA FAX

1  Plaintiff Robert P. Mosier, as Receiver for Private Equity Management
2  Group, LLC, Private Equity Management Group, Inc., and their subsidiaries and
3  affiliates ("Plaintiff," "Mosier," or the "Receiver"), hereby complains and alleges as
4  follows:

5  **OVERVIEW**

6  1.     Various entities ultimately controlled by either Private Equity
7  Management Group, LLC ("PEMG, LLC"), Private Equity Management Group,
8  Inc. ("PEMG, Inc."), and their subsidiaries and affiliates (collectively,
9  "PEMGroup"), offered and sold preferred shares, notes and bonds and other forms
10 of debt by representing to investors[1] in various offering memoranda that their
11 investment proceeds would be used to purchase and/or finance the maintenance of
12 life insurance policies issued to purportedly high net worth individuals, and/or to
13 invest in timeshare-related assets and potentially other assets.  PEMGroup
14 represented that both principal and interest were insured and "guaranteed."
15 PEMGroup raised close to $1 billion.

16 2.     Although PEMGroup was successful at raising funds, it was an
17 abysmal failure at investing in profit-generating life insurance policies, timeshares,
18 or any securities that could fund the companies' lavish operations, much less
19 generate the promised returns.  Instead, money received from investors was
20 improperly diverted to support PEMGroup's expensive operations, which included
21 excessive executive compensation, company jets, lavish executive retreats, and
22 even a multi-million dollar Disneyland vacation cruise for employees as part of
23 PEMGroup's annual holiday celebration.  Money was also diverted to individual
24 directors and/or officers indirectly in the form of improper and undocumented loans
25 to entities controlled by such individuals.

26

27 [1] As used herein, unless otherwise noted, "investors" refers to those entities and/or individuals
   investing in securities offered and sold by PEMGroup and/or various entities and affiliates
28 controlled by PEMGroup, and not shareholders or investors of PEMGroup.

3.     Because of PEMGroup's non-conforming use of investment proceeds, PEMGroup essentially promised investors an artificially high return on investments that did not exist and never materialized.  As a result, to sustain the illusion of legitimacy and fuel ever more investment, PEMGroup engaged in a classic "Ponzi Scheme" which operates by using new investment proceeds to repay principal on and provide returns to older preferred shares, notes and bonds and other debt.  To facilitate interest in PEMGroup's debt offerings, PEMGroup made at least four material misrepresentations to investors:  (1) PEMGroup claimed the source of the purported returns were profits generated by PEMGroup's investments in life insurance policies, when, in fact, the purported returns were often paid out of funds raised from subsequent investors; (2) in at least one instance, PEMGroup presented investors with a forged insurance policy in which the coverage amount had been altered from $31 million to $108 million to support a false claim that a particular investment was entirely covered by insurance; (3) PEMGroup misrepresented the educational and employment history of Danny Pang, PEMGroup's Chairman, by falsely claiming that he had received Bachelor's and Master of Business Administration degrees and that he had worked at the well-known brokerage house Morgan Stanley; and (4) PEMGroup misappropriated millions of dollars of investor funds on purchases, such as the purchase of private aircraft, lavish operating expenses, and undisclosed loans.  These misrepresentations are currently the subject of proceedings brought by the SEC.

4.     Throughout PEMGroup's course of fraudulent conduct, Defendant Anthony Bufinsky ("Defendant" or "Bufinsky") was a part owner and a member of PEMGroup's Board of Directors.  He was also a Managing Director, specializing in Islamic finance, structured senior settlements and structured finance.  He was the senior client relationship manager for raising investor capital within the Greater Asia and Middle East region.  As a member of PEMGroup's Investment Committee, he was responsible for selecting appropriate and compliant assets to

1   generate the returns PEMGroup promised to its investors.  In addition, because he
2   was a party thereto or expressly or tacitly approved the fraudulent conduct, he was
3   aware of all fraudulent conduct PEMGroup engaged in during his tenure from 2005
4   to his resignation on March 9, 2009.  Accordingly, Bufinsky is liable for breach of
5   fiduciary duty, conversion, gross negligence, professional negligence, waste of
6   assets, and unjust enrichment.

## PARTIES

8       5.      Plaintiff Mosier is the Court-appointed permanent receiver for
9   PEMGroup in an action pending before the United States District Court for the
10  Central District of California, the Honorable Philip Gutierrez presiding.

11      6.      Defendant Bufinsky was, at all relevant times mentioned herein,
12  Managing Director for PEMGroup.  Bufinsky resides in Irvine, California, located
13  within this District.

## OTHER PERSONS

15      7.      Danny Pang (deceased) ("Pang") resided in Newport Beach,
16  California.  Pang was one of the founders and a part owner and the Chairman and
17  CEO of PEMG, Inc.  Pang was also a managing member of PEMG, LLC.  Pang had
18  effective control of and access to all bank accounts into which investor funds were
19  placed.  Pang also controlled and directed the actions of Life Settlement Partners,
20  Inc., Life Settlement Partners Corporation, and Nevada Capital Holdings, Inc.

21      8.      PEMG, Inc. is a Nevada corporation located in Irvine, California.
22  PEMG, Inc. offered and sold securities issued by various entities and affiliates it
23  controlled.  Bufinsky, as a Managing Director, controlled and directed the actions
24  and operations of PEMG, Inc. with respect to investment decisions and general
25  directorial functions.  PEMG, Inc. purported to invest in life insurance policies and
26  interest in timeshare-related assets.

27

28

WEST\22068313.5                          3

9.     PEMG, LLC is a Nevada limited liability company located in Irvine, California.  Bufinsky, as a Managing Director, controlled and directed the actions and operations of PEMG, LLC with respect to investment decisions and general directorial functions.  PEMG, LLC took equity positions in certain investments made by PEMG, Inc.

10.     The officers of PEMGroup ("PEMGroup Management Team") included:  Danny Pang (Director, Chairman, CEO), Leon Chan (Director, Co-President), Robert Anderson (Director, Chief Operating Officer, Co-President), Nasar Aboubakare (Director, Former President and Chief Investment Officer), Steven Blair (Managing Director and General Counsel), Todd Gillespie (Senior Managing Director), Wilbur Quon (Managing Director and CFO), Peter Paul Mendel (Director, Chief Compliance Officer, Former General Counsel, Managing Director, and Corporate Secretary), Anthony Bufinsky (Managing Director), Sandra Chang (Managing Director), Andrew Shayne (Managing Director and Chief Investment Officer), Eric Sloane (Managing Director), and Robert Van Duren (Managing Director).

11.     The PEMGroup Board of Directors (the "PEMGroup Directors") consisted of Danny Pang, Robert J. Anderson, Wilbur Quon, Todd D. Gillespie, Peter Paul Mendel, Leon Chan, Sandra Chang, Anthony Bufinsky and, at various times, Nasar Aboubakare.  The PEMGroup Directors, in whole or in part, also served as the Directors of the PEMGroup subsidiaries and affiliates described herein.

12.     Pang, PEMGroup and the PEMGroup Management Team established affiliated so-called "special purpose vehicle" ("SPV") entities in the British Virgin Islands.  Each SPV offering was referred to as a "fund" or a "Tranche."  These SPVs and Tranches were managed and controlled by Pang and PEMGroup.  They raised $951 million through a series of offerings.  While the 2003 to early 2005 offerings involved preferred shares, from November 2005 through September 2008,

1   the offerings exclusively involved bonds, promissory notes and other forms of debt.

2   These offerings were made by SPVs named:  Genesis Voyager Equity Corporation

3   ("GVEC"); GVEC Resource, Inc. ("GVECR"); Genesis Voyager Equity II

4   Corporation ("GVEC II"); GVEC Resource II, Inc. ("GVECR II"); GVEC

5   Resource III, Inc. ("GVECR III"); and GVEC Resource IV, Inc. ("GVECR IV").

6   Each one of these SPVs was owned and controlled by PEMGroup affiliates and

7   controlled ultimately by Pang and PEMGroup.  The biggest client/investor for the

8   Tranches issued by these SPVs was Hua Nan Investment Trust Corporation, which

9   accounted for approximately 30% of the total dollars offered.  The Hua Nan

10   Investment Trust Corporation investments are:  GVECR II Debentures Series 2006-

11   A-1-A-4, January 1, 2007, $5,000,000 each; GVECR II Debentures Series 2006-A-

12   5, January 1, 2007, $2,460,000; GVECR II Debentures Series 2007 A, May 9,

13   2007, $12,560,000; GVECR II Debentures Series 2007 B, July 2, 2007,

14   $22,190,000, shared with Cosmos Bank; GVECR II Debentures Series 2007 C,

15   September 3, 2007, $115,840,000, shared with Cosmos Bank and Entie Bank;

16   GVECR II Debentures Series 2007 E, December 17, 2007, $56,350,000, shared

17   with Cosmos Bank; GVECR II Debentures Series 2008 B, February 4, 2008,

18   $45,170,000; GVECR II Debentures Series 2008 C, February 4, 2008, $11,900,000,

19   shared with Cosmos Bank; GVECR II Debentures Series 2008 A1-A4, March 7,

20   2008, $6,000,000 each; and GVECR II Debentures Series 2008 A5, March 7, 2008,

21   $6,616,225.

22        13.    The Tranches, dates established, amounts invested and other investors

23   were:

24             a.    GVEC Preferred Shares, October 31, 2003, $11,770,000, 55

25   individual investors;

26             b.    GVEC Preferred Shares A, February 2, 2004, $31,340,000,

27   Bank Sinopac and various individual investors;

28

1          c.      GVEC Notes A, June 28, 2004, $5,900,000, six individual

2    investors;

3          d.      GVEC Preferred Shares B1, April 25, 2005, $15,730,000,

4    Taiwan International Securities Corporation and 42 individual investors;

5          e.      GVEC PS C1, July 1, 2005, $3,090,000, 16 individual investors;

6          f.      GVEC PS D1, July 18, 2005, $60,000,000, Bank SinoPac;

7          g.      GVECR A1 Notes, November 15, 2005, $5,000,000, IIT, Hi

8    Bank;

9          h.      GVECR A2, Notes, November 15, 2005, $3,000,000, IIT;

10         i.      GVECR A3, Notes, November 15, 2005, $2,114,100, IIT;

11         j.      GVECR C1 Notes, November 15, 2005, $1,000,000, IIT;

12         k.      GVECR C2 Notes, November 15, 2005, $934,700, IIT;

13         l.      GVECR D1 Notes, November 15, 2005, $1,000,000, IIT;

14         m.      GVECR D2 Notes, November 15, 2005, $1,493,800, IIT;

15         n.      GVECR E1 Notes, November 15, 2005, $2,500,000, IIT;

16         o.      GVECR E2 Notes, November 15, 2005, $2,472,500, IIT;

17         p.      GVECR B Notes, January 2, 2006, $5,000,000, Coretech;

18         q.      GVECR F1 Notes, March 21, 2006, $4,500,000, Truswell

19    Securities Investment Trust;

20         r.      GVECR IV Notes A, July 26, 2006, $75,120,000, Standard

21    Chartered Bank (formerly Hsinchu International Bank);

22         s.      GVEC II CDO Series 2006, August 1, 2006, $32,000,000, Bank

23    SinoPac;

24         t.      GVEC II Debentures Series 2006-A, October 10, 2006,

25    $55,000,000, Bank SinoPac;

26         u.      GVECR IV Notes C, December 7, 2006, $100,050,000,

27    Standard Chartered Bank (formerly Hsinchu International Bank);

28

1        v.        GVECR IV Notes D, December 28, 2006, $79,960,000,

2  Standard Chartered Bank (formerly Hsinchu International Bank);

3        w.        GVECR III Notes – Series 2007 A-4, April 2, 2007,

4  $16,870,000, Cosmos Bank, Entie Bank;

5        x.        GVECR II Debentures Series 2007 D, November 1, 2007,

6  $15,550,000, Cosmos Bank, Entie Bank;

7        y.        GVECR II Debentures Series 2008 E, April 30, 2008,

8  $33,341,000, Entie Bank, Taichung Bank;

9        z.        GVECR II Debentures Series 2008 G, May 30, 2008,

10  $18,860,000, Entie Bank, Taichung Bank;

11       aa.       GVECR II Debentures Series 2008 I, July 2, 2008, $14,533,000,

12  Taichung Bank;

13       bb.       GVECR II Debentures Series 2008 H-6, July 31, 2008,

14  $12,380,000, Taichung Bank;

15       cc.       GVECR II Debentures Series 2008 H-7, July 31, 2008,

16  $8,500,000, Coretech; and

17       dd.       GVECR II Debentures Series 2008 J, September 3, 2008,

18  $15,621,000, Taichung Bank.

19       14.       PEMGroup subsidiaries and affiliates include:  GVEC, GVEC

20  Resource, Inc.; GVEC Resource II, Inc.; GVEC Resource III, Inc.; GVEC Resource

21  IV, Inc.; GVEC Resource V, Inc.; GVEC Resource VI, Inc.; GVEC Acquisitions,

22  Inc.; Genesis Voyager Equity II Corporation; Genesis Voyager Assets Management

23  Ltd.; Genesis Voyager Equity Corporate Resources I, Inc.; GVEC Investments

24  Corporation; Epoch Investment Holding Corporation; Fides Insurance Company,

25  Ltd.; Irvine Insurance Company (BVI), Ltd.; Equity Resource Management (BVI),

26  Ltd.; Equity Resource Management, Ltd. ("ERML"); Dominical Holdings, LLC;

27  Jorei Enterprises, LLC; Irvine Capital Holdings, LLC; and Zhongguo Investments

28  Corporation.

WEST\22068313.5                              7

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 754, which expressly vests receivers "with complete jurisdiction and control of all such property" located in this district.  Jurisdiction over the subject matter of this action also exists because the claims alleged herein involve Receivership Assets as described in the Court's Preliminary Injunction and Orders Appointing a Permanent Receiver.  That Order states that all disputes relating to Receivership Assets must be filed in this Court.

16.     Venue for this action is proper in the Central District of California because (1) this action is ancillary to the United States Securities and Exchange Commission proceedings pending in this District; (2) the Receiver was appointed by this Court; (3) this action involves Receivership Assets within the meaning of the Preliminary Injunction and Orders Appointing a Permanent Receiver, which requires that all such disputes be filed in this District; (4) certain transactions, acts, practices and causes of conduct occurred within this District; and (5) Bufinsky resides in this District.

## SEC PROCEEDING

17.     On April 24, 2009, the United States Securities and Exchange Commission ("SEC") initiated Securities and Exchange Commission, Plaintiff v. Private Equity Management Group, LLC; Private Equity Management Group, Inc.; and Danny Pang, Defendants, Case No. CV 09-2901 PSG (Ex) ("SEC Proceedings"), and sought to have a Receiver appointed for the entities named in that case.  On July 2, 2009, the United States District Court for the Central District of California granted, and on August 4, 2009 entered, an Order Appointing a Permanent Receiver (the "Order").  The Order appointed Plaintiff as the Receiver for PEMGroup and its related entities.

## INVESTMENT OFFERINGS

18.    Pang, PEMGroup and the SPVs offered and sold securities promising rates of return between 5.25% to 7.55%, paid semi-annually or annually. The offerings for 2003 through July 2005 included preferred shares, while the offerings from November 2005 through September 2008 were exclusively debt offerings including notes, bonds and other forms of debt.

19.    In connection with each of the offerings, on behalf of the SPVs, PEMGroup, Pang, and Bufinsky prepared and delivered to investors Confidential Preliminary Private Offering Memoranda ("CPPOMs") and Confidential Private Offering Memoranda ("CPOMs") that, among other things, represented to investors how their funds would be used.

20.    Between 2004 and 2005, PEMGroup conducted several offerings to raise money for GVEC. The GVEC offerings were conducted in six Tranches. The funds raised in the six GVEC Tranche offerings were used to purchase life insurance policies. In return for their investments in the GVEC offerings, investors were promised annual interest payments of between approximately 6% and 7.1%, which were payable semi-annually, as well as the return of their principal upon maturity.

21.    Between January 2006 and December 2006, PEMGroup conducted several debt offerings to raise money for GVECR IV. The GVECR IV offerings were conducted in three Tranches: (1) GVECR IV Notes A; (2) GVECR IV Notes 2006 C; and (3) GVECR IV Notes 2006 D. The proceeds raised in the GVECR IV debt offerings were primarily intended for investments in timeshare-related assets. Instead, the money raised from these debt offerings was used to, among other things, purchase coal mines in China, purchase a small number of insurance policies, make loans to Emrise Corporation and invest in the Frontier Oceano Luxury Ship.

22.   The GVECR IV A, C and D debt offerings consisted of 48-month notes at 6% interest.  Interest was payable semi-annually with principal repayment at the maturity date.  They were described as "asset backed securities."  The CPOMs stated that the net proceeds from the sale of the notes would be used by the issuer to "…purchase the Underlying Assets, which include without limitation: senior acquisition and development loans; subordinated acquisition and development loans; timeshare receivable loans; management fee receivable loans; and community fee receivable loans."  These "Underlying Assets" were to be pledged to secure the notes.  In addition, the Underlying Assets could not have a term of more than 48 months, and the CPOMs specified the types of assets under consideration, which all had to be rated A or better by A.M. Best: Secured loans for acquisition and development; tranches of timeshare related securitizations; secured residential bridge mortgages; mortgage loans for acquisition and development; and preferred return investments in timeshare related limited partnerships, LLCs or other entities with performance assurances.  The issuer was to grant to the trustee for the benefit of the noteholders a first priority security interest in the Underlying Assets to secure the issuer's obligations under the notes.  The CPOMs stated the noteholders would be provided with annual portfolio reports about the assets and receivables purchased from the proceeds of the offering by March 1 of each year.  Pursuant to these CPOMs, a custodian or trustee would hold the invested capital and assets acquired with the proceeds of the offerings.  The CPOMs on the C and D offerings further stated that the Underlying Assets would consist of a segregated portfolio of various timeshare assets and receivables and that they would be held in trust.

1    23.    The CPPOMs and CPOMs associated with the GVECR IV Notes A,

2  GVECR IV Notes 2006 C, and GVECR IV Notes 2006 D offerings were delivered

3  to Hsinchu International Bank (which was subsequently purchased by Standard

4  Chartered Bank) in or around July 2006, November 2006 and December 2006,

5  respectively.

6    24.    Finally, under a section labeled "Assurance and the Assuror," the

7  following language appears:

8          Assurance.  Payout of principal of and interest on the
           Notes may be assured pursuant to an Assurance (the
9          "Assurance") issued by Hannover Re, a bank, a financial
           institution, or other entity whose general unsecured
10         obligations are rated not less than "A" by A.M. Best
           Issuer, Inc.; Standard & Poor's, a division of the
11         McGraw-Hill Companies, Inc.; Moody's Investor Service,
           Inc.; Fitch, Inc. or a similar rating agency.
12

13  A different Assuror was identified for each offering:  Hannover Re for Notes A,

14  HCC Reinsurance, Ltd. for Notes C, and Swiss Re, CIFG or HCC for Notes D.

15    25.    In August 2006, PEMGroup conducted a debt offering to raise money

16  for a Tranche called GVEC II CDO Series 2006.  According to the applicable

17  CPOM, the proceeds from the GVEC II CDO Series 2006 were primarily intended

18  for, and were represented to investors as, investments in timeshare-related assets.

19  The language was similar to the language in the GVECR IV offerings.  A different

20  Assuror, Hannover Rueckversicherung, AG, was identified.  Bank SinoPac was the

21  only investor in this offering.

22    26.    In October 2006, PEMGroup conducted a debt offering to raise money

23  for a Tranche called GVEC II Debentures Series 2006-A.  According to the

24  applicable CPOM, the proceeds of the GVEC II Debentures Series 2006-A were

25  primarily intended for, and were represented to investors as, investments in life

26  insurance related assets.  The CPOM represented that the company would acquire

27  contestability period insurance policies and residual value insurance policies to

28  protect against loss.  Bank SinoPac was the only investor in this offering.

WEST\22068313.5

11

COMPLAINT

27.     Between December 2006 and September 2008, PEMGroup conducted several debt offerings to raise money for GVECR II.  The GVECR II offerings were conducted in approximately 23 Tranches as set forth in paragraphs 12 and 13 above.  Some of the CPPOMs and CPOMs associated with the GVECR II offerings represented that proceeds would be used to purchase life insurance related assets plus other assets to assure the stated rates, and were delivered to Hua Nan Bank, Cosmos Bank, Taichung Bank, Coretech, and Entie Bank, who were the five principal investors in the GVECR II Tranche.  More specifically, the following language appears in the CPPOMs and/or CPOMs for the GVECR II 2007 C, GVECR II 2008 A1 and GVECR II 2008 G offerings (which were delivered to investors on or around September 3, 2007, January 1, 2008 and May 1, 2008, respectively) under the "USE OF PROCEEDS" heading:

> The Issuer intends to use the Offering proceeds to engage in premium finance transactions, with the balance of proceeds used to pay (a) acquisition, servicing trustee, custodian and origination fees, (b) management fees to the Manager, advisory fees to the Advisor, and (c) administrative fees and expenses associated with this Offering.
>
> The Issuer will use the proceeds from the Offering to acquire assets (the "Assets") consisting of:
>
> •     a portfolio of recourse and non-recourse premium finance loans (the "Loans") for the purchase of, and secured by a senior security interest in, newly-issued, non-variable life insurance policies (the "Policies") insuring high-net-worth individuals over the age of 70 (the "Seniors");
>
> •     beneficial interest in a structured irrevocable life insurance trust (an "ILIT") that contains Policies;
>
> •     Policies acquired by the Issuer as a result of borrowers' Loan defaults, voluntary relinquishment of Policies by borrowers to the Issuer in satisfaction of the Loans or through the secondary market; and
>
> •     a twenty-four (24) month interest reserve.
>
> The Issuer intends to acquire adequate Assets within three (3) months of the Issuance Date to secure periodic interest payments and repayment of principal to Debenture

Holders at the Maturity Date. The Assets underlying the Debentures will be held by a trustee in one or more segregated custodial accounts with the Issuer as beneficiary.  The Issuer intends to commence liquidation of adequate Assets not less than three (3) months prior to the Maturity Date to ensure payment of all principal and accrued but unpaid interest at the Maturity Date.

28.    Other CPPOMs and CPOMs issued in connection with the GVECR II Tranches stated that the Issuer would purchase contestability period insurance and residual value insurance while others indicated that the portfolio would be secured by insurance or reinsurance.

29.    In April 2007, PEMGroup conducted a debt offering to raise money for GVECR III.  The GVECR III debt offering consisted of 48-month notes at 6% interest.  The interest was payable semi-annually with the principal due upon maturity of the notes.  The notes were described as "asset backed securities."  The CPOM stated that the net proceeds from the sale of the notes would be used by the issuer to acquire a portfolio of various infrastructure and timeshare assets and receivables.  The Underlying Asset language was similar to that used in the GVECR IV offerings, as was the "Assurance and Assuror" language, although different Assurors (Swiss Re, Hannover Re, or HCC Re) were identified.  The CPOM stated that the assets of the issuer that would be pledged to secure the notes would be held in a segregated portfolio.  It stated that the notes would be secured by the Underlying Assets and that the issuer would grant to the trustee for the benefit of the noteholders a first lien security interest in the Underlying Assets.  It stated that the noteholders would be provided with annual portfolio reports of the assets and receivables purchased with the proceeds of the offering by March 1 of each year.

13

## DIVERSION, CONVERSION AND
## MISAPPROPRIATION OF INVESTMENT PROCEEDS

30.    As early as August 2006, Pang and PEMGroup had largely failed to effectuate the timeshare deals that were described in CPOMs provided to Standard Chartered Bank in connection with its investments in the GVECR IV Notes A, Notes 2006 C and Notes 2006 D funds.  As a result, the bulk of Standard Chartered Bank's $220 million investment became a "slush fund" from which Pang and PEMGroup misdirected and misappropriated millions of dollars.

31.    Likewise, PEMGroup failed to identify investments that conformed to the CPOMs and/or CPPOMs issued in connection to other debt offerings, including the Hua Nan Investment Trust Corporation's almost $300 million investment.  Contrary to the explicit language in the CPPOMs and/or CPOMs regarding use of offering proceeds, starting in approximately September 2006, PEMGroup and Pang actually used the proceeds of various offerings for a variety of illicit and undisclosed purposes, which included but were not limited to: (1) the purchase of impaired life insurance policies from earlier Tranches; (2) millions of dollars in loans to PEMGroup to fund the company's exorbitant operating expenses; (3) millions of dollars in unsecured and undocumented personal "loans" to Pang; (4) millions of dollars of excessive compensation, fees, commissions and bonuses to Pang and the PEMGroup Management Team; and (5) hundreds of millions of dollars of loans and investments in high risk nonconforming assets never disclosed in the CPPOMs and CPOMs.  None of these uses and/or misappropriation of funds were disclosed to the investors.

1                 **Improper Loans To PEMGroup Using Tranche Funds**

2           32.     By October 2006, after it had become clear that PEMGroup's cash

3 burn rate had become unsustainable as a result of the profligate spending that the

4 company undertook at Pang's direction, Pang decided to use the Tranche funds that

5 had already been raised, as well as funds that would be raised by PEMGroup in the

6 future, in order to pay PEMGroup's operating expenses. Pang and PEMGroup used

7 Tranche funds to make undisclosed loans to PEMGroup to fund operating expenses

8 which included payment of salaries, private aircraft trips, four-star hotels, office

9 expansions and renovations, and various other "operational" expenses.

10 Specifically, Pang caused the SPVs to make loans to PEMGroup, which, in turn,

11 used the funds for various operating expenses of the company, which included but

12 were not limited to: payroll costs, the opening of a new PEMGroup office in

13 Shanghai, a 2007 Christmas party in China (which was attended by employees from

14 all PEMGroup offices) and a 2008 Christmas party aboard a Disney cruise ship

15 (which was attended by employees, families and friends of PEMGroup).

16           33.     In addition to the undisclosed loans to PEMGroup for its operating

17 expenses, in 2007, Pang and PEMGroup caused Tranche funds to be utilized to

18 make loans to PEMGroup for the purpose of aircraft acquisitions. On March 14,

19 2007, Pang and PEMGroup caused a $2.1 million loan to be made from GVECR IV

20 2006 C to InterTravel and Services, Inc. ("ITSI"), an entity controlled by Pang and

21 PEMGroup. In June 2007, Pang and PEMGroup caused an $18 million loan to be

22 made from GVECR IV 2006 D to ITSI. This $18 million dollar loan was used to

23 fund the purchase of a Gulfstream G4 aircraft for PEMGroup. On October 16,

24 2007, Pang and PEMGroup caused an $11 million loan to be made from GVECR II

25 2007 C to ITSI. This $11 million dollar loan was used to fund the purchase of a

26 Learjet aircraft for PEMGroup.

27

28

COMPLAINT

34.     The CPPOMs and CPOMs associated with the affected SPVs never disclosed to investors the material information that the proceeds of offerings could be used to make "loans" to PEMGroup to enable the company to fund its exorbitant operating expenses or to allow PEMGroup to purchase private aircraft.  Likewise, investors in the pertinent SPVs were never otherwise informed that the proceeds of offerings had been used to make loans to PEMGroup to fund its exorbitant operating expenses and to purchase private aircraft.  PEMGroup owes the SPVs approximately $21.6 million in outstanding loans.

35.     In a February 17, 2009 memorandum to Pang and the other PEMGroup partners including Defendant Bufinsky, PEMGroup's General Counsel, Steven Blair, acknowledged that the loans made to PEMGroup were improper:

> I am of the opinion that many of the loans to the PEMGROUP companies do not fall within the provisions of the CPOMS, the basis upon which the funds were provided by the investors and set out the contractual obligations that the issuers and their agents and subcontractors, namely our good selves, are subject.  As a result, if there is a shortfall with respect to repayment of the Tranches to the investors and this shortfall is in any way impacted as a result of such loans, the liability for that shortfall will, I consider, fall upon you as the proprietors.  The rationale being not only is there a clear breach of contractual obligations, but also a breach of the fiduciary duty owed to investors with regard to the management and investment of their funds.

## Improper Loans To Pang Using Tranche Funds

36.     At least as early as July 2007, Pang began to take unsecured and interest free personal "loans" from several of the SPVs and other PEMGroup related entities, which held Tranche proceeds.  The overwhelming majority of these supposed loans were never repaid to the SPVs or PEMGroup affiliates.

37.     For instance, on or around July 26, 2007, Pang caused ERML (a PEMGroup entity) to loan $1 million to Nevada Capital Partners ("NCP"), which is an entity controlled by Pang.  On or around April 22, 2008, Pang caused GVECR IV Notes A to loan him $1 million.  No contemporaneous formal documentation

was created and no collateral or security was provided at the time of the purported loans from the various SPVs to Pang and/or the various entities he controlled.  In total, Pang caused the SPVs and other PEMGroup entities to "lend" him approximately $13,600,000.  Pang's outstanding indebtedness to the SPVs and PEMGroup is approximately $10.88 million.

### Payment Of Excessive Executive Compensation Using Tranche Funds

38.     Pang and the PEMGroup Management Team looted PEMGroup and the SPVs and their Tranches by paying lavish and excessive compensation, fees, bonuses, and commissions to themselves either directly or by indirectly diverting such funds to themselves.  These payments benefited Pang and the PEMGroup Management Team and injured PEMGroup and the SPVs, rendering them unable to pay their debts.  From 2004 through 2009, the PEMGroup Management Team was paid $107,385,038 in compensation, fees, commissions and bonuses, as follows: Danny Pang, $57,699,740; Bob Anderson, $3,568,092; Nasar Aboubakare, $9,459,683; Steven Blair, $2,126,004; Todd Gillespie, $7,097,177; Wil Quon, $6,448,329; Peter Paul Mendel, $1,585,519; Anthony Bufinsky, $1,298,049; Sandra Chang, $1,382,134; Andrew Shayne and Eric Sloane, $2,433,652; Leon Chan, $13,890,642; and Bob Van Duren, $396,016.  In 2008 alone, Pang received total compensation from PEMGroup in the amount of approximately $32.9 million.  In 2008, the average base salary for the eight PEMGroup partners, including Bufinsky, was $687,500.  When fees, bonuses and commissions are added, this average exceeds $3 million.

39.     In addition, the following persons received up front start up Tranche fees as follows:  Danny Pang, $11,733,541; Leon Chan, $12,680,666; and Rick Chen and James Yen, $1,302,500.

### Improper Investments In Non-Conforming Assets Using Tranche Funds

40.     During 2007 and 2008, the PEMGroup Management Team used Tranche funds to invest in high risk and imprudent loans, equity investments,

mezzanine debt, real estate loans, undeveloped land in Costa Rica, a Chinese company which owns coal mines, and Chinese investment funds, which were never disclosed to the investors and are not within the scope of conforming and permissible uses of the offering proceeds described and set forth in the CPOMs and/or CPPOMs:

a. On April 20, 2007, Pang and the PEMGroup Management Team caused a total of $7,432,000 in funds, a combination of equity and debt, from the GVEC Resource IV, Inc. 2006 C Tranche to be loaned to Frontier Oceano Acquisitions to fund the design of a luxury ship with 200 private residences and 265 suites for cruise passengers ("Project Utopia").

b. On May 15, 2007, Pang and the PEMGroup Management Team caused the GVEC Resource IV, Inc. 2006 C Tranche to loan $19,429,000 of funds to eSuites Hotels, LLC, to acquire parcels of land in Arizona, Florida and North Carolina which were zoned for hotel development.

c. On July 18, 2007, Pang and the PEMGroup Management Team caused GVEC Resource III, Inc. A-4 Tranche to invest $3 million to acquire common membership interests in TapouT, a private sports clothing and reality TV company.

d. From September 7, 2006 to September 7, 2007, Pang and the PEMGroup Management Team caused $41 million of funds from the GVEC Resource IV, Inc. 2006 A, 2006 C and 2006 D Tranches to be loaned to a PEMGroup affiliate, GVEC Acquisitions, Inc., which used the loan to acquire shares in China Natural Investment Holding Company, a Chinese company involved in acquiring, exploring and developing mining properties in China with a strong focus in coal, including five coal mines ("China Natural Project").

e.     On November 30, 2007 and August 20, 2008, Pang and the PEMGroup Management Team caused the GVEC Resource IV, Inc. 2006 D Tranche to loan $13,346,000 to the EMRISE Corporation, a public company which designs, manufactures and markets electronic devices and communications equipment for aerospace defense, industrial and communications applications.

f.     On February 4, 2008, Pang and the PEMGroup Management Team caused the GVEC Resource II, Inc. 2007 E Tranche to loan $7,500,000 to Baker's Footwear, a public company which was a specialty retailer of footwear and accessories for young women.

g.     On August 7, 2008 and October 7, 2008, Pang and the PEMGroup Management Team caused the GVEC Resource II, Inc. 2007 C and 2007 D Tranches to use $8,713,000 to acquire undeveloped land in Costa Rica consisting of 955 acres.

## Bufinsky's Knowledge Of And Participation In
## Misappropriation of Tranche Funds

41.     Defendant Bufinsky, as a Managing Director and member of the Board of Directors of PEMGroup, and a member of the Investment Committee responsible for divestitures and selecting conforming investments as required by the appropriate CPOMs and CPPOMs, was well aware of Pang and PEMGroup's misappropriation of funds.  For example, Bufinsky is copied on an email, dated February 23, 2009, purporting to show the asset allocation for the GVECR II 2008 A-C, G, I and J Tranches.  Notably, all of the Tranches purport to show life settlement assets when in reality, Bufinsky knew that the proceeds from these Tranches were used to make investments in some of the non-conforming projects identified in paragraph 41, above.  On August 12, 2008, Bufinsky received an email which reports on the status of Project Utopia, PEMGroup's residential cruise ship investment.

42.     Bufinsky also approved misappropriations or tacitly approved misappropriations and conversion of Tranche funds through his inaction. For example, Bufinsky is copied on email correspondence from May 2007 relating to the use of GVECR IV Notes C Tranche proceeds to fund PEMGroup's investment in the China Natural Project. Bufinsky received an email, dated May 18, 2007, confirming the transfer of $3 million from the GVECR IV Notes C account to the China Natural Project. He also received an email on November 19, 2008 relating to the transfer of $1 million from the proceeds of the GVECR III Tranche to invest in TapouT, a private sports clothing and reality TV company.

43.     Bufinsky was an addressee of an October 10, 2008 PEMGroup Initiative Memorandum which discussed overseas office closings; plans to purchase aircraft for $4.5 million; the budget for the 2008 Holiday Retreat of approximately $1.83 million for the Disney cruise and Grand Floridian stay including airfare, meals and entertainment; and reduction in the eight partners' base pay of 20% or a $1.1 million.

44.     Defendant Bufinsky, as a member of the Investment Committee and a PEMGroup Managing Director, was an active participant in PEMGroup's investments in non-conforming assets using Tranche funds. Defendant Bufinsky was part of PEMGroup's "Executive Committee" involved in various aspects of the EMRISE Corporation, eSuites Hotels, LLC, and Baker's Footwear transactions referenced above. Defendant Bufinsky was also involved in various aspects of the China Natural Project, TapouT, and the Costa Rica deals discussed above. In addition, the tax returns for the partnership entities of PEMGroup, of which Bufinsky is a member, disclose the investment in and personal tax implications of Project Utopia. He also participated in the due diligence for the Costa Rica deal described in paragraph 41, above.

45.     By approving, participating and/or failing to correct the misappropriation of Tranche funds, Defendant Bufinsky caused PEMGroup to operate as a Ponzi Scheme.  Defendant Bufinsky never informed investors that their funds would be used for any of the aforementioned improper purposes.  To the contrary, less than a month before he resigned on March 9, 2009, Bufinsky is copied on an email dated February 23, 2009 discussing the asset allocation for some of the Hua Nan Investment Trust Corporation subscriptions that were still only projected and had not actually been realized as required by the operative CPPOMs and/or CPOMs.

46.     The conduct alleged herein is only a sampling of Defendant Bufinsky's tortious conduct.  Plaintiff Mosier is continuing to investigate the full extent of Defendant Bufinsky's tortious conduct.

## FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty

47.     Plaintiff hereby incorporates by reference the proceeding paragraphs as if fully set forth herein.

48.     By reason of his position as a Managing Director and investment committee member, and because of his ability to control the business and corporate affairs of PEMGroup as herein alleged, Defendant Bufinsky owed PEMGroup fiduciary obligations of trust, loyalty, good faith, and due care, and was required to use his utmost ability to control and manage PEMGroup in a fair, just, honest, and equitable manner.  Defendant Bufinsky was at all times required to act in furtherance of the best interests of PEMGroup and not in furtherance of his own personal interest or benefit.  Bufinsky was required to exercise good faith and diligence in the administration of the affairs of PEMGroup and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

1    49.   By virtue of his fiduciary duty, Defendant Bufinsky was required to,
2    among other things:

3              a.   Ensure that PEMGroup complied with its legal and contractual
4    obligations and requirements, including using Tranche funds as designated in
5    CPOMs and/or CPPOMs, acting only within the scope of its legal and contractual
6    authority;

7              b.   Conduct the affairs of PEMGroup and its SPVs in an efficient,
8    professional manner in order to avoid wasting PEMGroup assets;

9              c.   Accept a reasonable overall compensation package that is
10   transparent and provides Defendant Bufinsky with accountability;

11             d.   Remain informed as to how PEMGroup conducted its
12   operations, and, upon receipt of notice or information of imprudent or unsound
13   conditions or practices, make a reasonable inquiry in connection therewith, and take
14   steps to correct such conditions or practices;

15             e.   Ensure that PEMGroup was operated in a diligent, honest, and
16   prudent manner in compliance with all applicable laws, rules, and regulations; and

17             f.   Conduct and oversee transactions and investments between the
18   various SPVs in a fair and neutral manner without depriving one SPV for the
19   benefit of the other.

20   50.   By his conduct as alleged herein, Defendant Bufinsky breached his
21   fiduciary and other duties to PEMGroup.

22   51.   Defendant Bufinsky's breaches of fiduciary duty caused excessive
23   compensation to be paid to the PEMGroup Management Team, including
24   Defendant.  They also resulted in significant litigation exposure from the SEC and
25   defrauded Tranche investors.  In addition, Defendant Bufinsky's breaches of
26   fiduciary duty also caused PEMGroup's lavish operational expenditures,
27   undocumented and significant loans to Pang and related entities, to run unchecked.

28

52.     As a direct, causal, and proximate result of Defendant Bufinsky's aforementioned breaches of fiduciary duties to PEMGroup, Plaintiff Mosier, through PEMGroup, has suffered significant damages in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF

### Conversion and Conspiracy to Convert

53.     Plaintiff hereby incorporates by reference the proceeding paragraphs as if fully set forth herein.

54.     As set forth fully above, Pang and the PEMGroup Management Team solicited investors to invest in PEMGroup and the Tranches for the purpose of purchasing specific assets, including life insurance and timeshare-related assets. The CPOMs and CPPOMs required the offering proceeds to be used for specific investments.

55.     Defendant Bufinsky either expressly or tacitly formed an agreement and understanding with Pang and the PEMGroup Management Team that the offering proceeds could and would be used for improper purposes and in breach of the representations made to investors, and as alleged herein, committed overt acts in furtherance of said conspiracy.

56.     When PEMGroup received the offering proceeds on behalf of the SPVs and Tranches, PEMGroup, with Defendant Bufinsky's knowledge, acquiescence and participation, failed to use the offering proceeds as promised and required under the CPOMS and CPPOMs.  More specifically, a substantial portion of the offering proceeds were misappropriated and converted as follows:

        a.     To purchase impaired life insurance policies from earlier SPV Tranches;

        b.     To make loans to PEMGroup to fund its exorbitant operating expenses, including funding the establishment of lavish office locations, purchasing corporate jets, and funding excessive travel and entertainment expenses;

c.      To make unsecured and undocumented personal loans to Pang and entities he controlled;

d.      To misapply and divert the offering proceeds into improper, unauthorized and imprudent loans and investments not in accordance with the uses of funds set forth in the CPOMs or the CPPOMs; and

e.      To pay themselves excessive and unearned fees, bonuses, and commissions.

57.     Mosier, as PEMGroup's receiver, is entitled to possession of these wrongfully diverted funds. Demand for payment or reimbursement of these funds has proven futile. Moreover, Mosier has expended a substantial amount of money and resources in an attempt to recover the diverted funds, all to PEMGroup's further damage.

58.     By virtue of the forgoing conduct, Bufinsky and the PEMGroup Management Team have intentionally, unlawfully and wrongfully deprived PEMGroup and the SPV Tranches it controlled of the funds to purchase the promised assets, thereby seriously interfering with PEMGroup's and the SPV Tranches' ability to pay their debts, and have exercised wrongful dominion, control, and/or use of the funds for their own benefit or for the benefit of their coconspirators and agents.

59.     As a direct and proximate cause of Defendant Bufinsky's conduct, PEMGroup has sustained damages in an amount to be proven at trial including those damages described more fully above.

COMPLAINT

1

## THIRD CLAIM FOR RELIEF

2

### Gross Negligence

3    60.   Plaintiff hereby incorporates by reference the proceeding paragraphs as

4    if fully set forth herein.

5    61.   Defendant Bufinsky was a Managing Director and a member of the

6    Investment Committee.  By virtue of his various positions with the PEMGroup

7    entities, Bufinsky owed a duty to the company and investors.  Yet, in breach of his

8    duty, he did not challenge PEMGroup's misappropriation of funds in investments

9    that were far afield of the CPOMs or CPPOMs such as the investments in Project

10   Utopia, the China Natural Project, and the EMRISE Corporation, eSuites Hotels,

11   LLC, Baker's Footwear, and TapouT deals referenced above.

12   62.   After the Tranche funds were misappropriated, repayment of the

13   principal and interest due on earlier notes would be impossible unless a money-

14   making machine were invented (*i.e.* a Ponzi Scheme).  Yet, Defendant Bufinsky

15   continued to rubberstamp PEMGroup's precarious financial plans.  For example,

16   without any data, Defendant Bufinsky approved a $100,000 loan to a related

17   PEMGroup entity, Dominical Holdings, LLC in February 2009.  He was also

18   copied on a February 26, 2009 email where a $1 million increase in the face amount

19   of a life insurance policy was approved without any data.  In addition, he falsified

20   documents to raise capital from investors.

21   63.   Defendant Bufinsky's want of even scant care or an extreme departure

22   from the ordinary standard of conduct expected in light of the circumstances

23   detailed above, caused PEMGroup to suffer damages.  As a direct and proximate

24   result of Defendant Bufinsky's gross negligence, PEMGroup was damaged in an

25   amount to be proven at trial including those damages described more fully above.

26

27

28

## FOURTH CLAIM FOR RELIEF

### Professional Negligence

64.     Plaintiff hereby incorporates by reference the proceeding paragraphs as if fully set forth herein.

65.     Professionals, including officers and directors of companies, are negligent if they fail to use the skill and care that reasonably careful professionals would have used in similar circumstances.

66.     As Managing Director of PEMGroup, and a member of its Investment Committee, Defendant Bufinsky had a duty to PEMGroup to use skill, prudence and diligence as other members in this profession commonly possess and exercise in performing obligations such as those pertaining to the use of investor funds and company operations.

67.     Defendant Bufinsky breached his duties, as set forth above, and fell below the standard of care.

68.     The breach of such duties by Defendant Bufinsky caused Plaintiff Mosier, through PEMGroup, millions of dollars of damages to be proven at trial including those damages described more fully above.

## FIFTH CLAIM FOR RELIEF

### Waste of Assets

Plaintiff hereby incorporates by reference the proceeding paragraphs as if fully set forth herein.

69.     The wrongful conduct alleged regarding the misappropriation of Tranche funds was continuous, connected, and on-going from approximately September 2006 through February 2009.  It resulted in continuous, connected, and on-going harm to PEMGroup.

70.     As a result of the misconduct described above, Defendant Bufinsky wasted corporate assets by, among other things: (i) paying bonuses and non-equity incentive compensation to certain PEMGroup executive officers; (ii) funding lavish

1  holiday parties; (iii) buying several private aircraft; and (iv) incurring potentially

2  hundreds of millions of dollars of legal liability and/or legal costs to defend the

3  unlawful actions of the various PEMGroup directors and officers.

4      71.   As a result of the waste of corporate assets, Defendant Bufinsky is

5  liable to PEMGroup.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

8      72.   Plaintiff hereby incorporates by reference the proceeding paragraphs as

9  if fully set forth herein.

10     73.   The wrongful conduct alleged regarding misappropriation of Tranche

11  funds from approximately September 2006 through February 2009 was continuous,

12  connected, and on-going throughout the applicable time period.  It resulted in

13  continuous, connected, and on-going harm to PEMGroup and its affiliates.

14     74.   By his wrongful acts and omissions, Defendant Bufinsky has been

15  unjustly enriched at the expense of and to the detriment of PEMGroup.  Defendant

16  Bufinsky has been unjustly enriched as a result of the compensation and direct

17  remuneration he received while breaching fiduciary duties owed to PEMGroup.

18     75.   PEMGroup seeks restitution from Defendant Bufinsky, and an order of

19  this Court disgorging all profits, benefits, and other compensation obtained by him

20  stemming from his wrongful conduct and fiduciary breaches.

21     76.   Plaintiff, on behalf of PEMGroup, has no adequate remedy at law.

1

**PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiff prays for judgment against Defendant Bufinsky, as

3 follows:

4      A.     For damages in an amount to be proven at trial;

5      B.     For an order directing Defendant to disgorge and pay over to Plaintiff

6 all trustee fees received by Defendant;

7      C.     For costs of suit herein incurred; and

8      D.     For such other and further relief as the Court may deem proper.

9

10 Dated: February 15, 2011                    DLA PIPER LLP (US)

11                                             By _____

12                                                NICOLAS MORGAN
                                                  JOSHUA BRIONES
13                                                ANA TAGVORYAN
                                                  Attorneys for Plaintiff
14                                                Receiver Robert P. Mosier

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV11- 274 CJC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

NICOLAS MORGAN (SBN 166441)
JOSHUA BRIONES (SBN 205293)
ANA TAGVORYAN (SBN 246536)
DLA PIPER LLP (US)
1999 Avenue of the Stars, Suite 400
Los Angeles, California 90067
Tel: (310) 595-3000
Fax: (310) 595-3300

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ROBERT P. MOSIER, Receiver for PRIVATE
EQUITY MANAGEMENT GROUP, LLC and
PRIVATE EQUITY MANAGEMENT GROUP, INC.
PLAINTIFF(S)

v.

ANTHONY BUFINSKY; and DOES 1-5, inclusive
DEFENDANT(S).

CASE NUMBER

**SACV11-00274** *CJC* (RNBx)

**SUMMONS**

TO:DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Nicolas Morgan/Joshua Briones/Ana Tagvoryan, whose address is DLA PIPER LLP (US), 1999 Avenue of the Stars, 4th Floor, Los Angeles, CA, 90067. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____ FEB 1 5 2011 _____

By: **CHRISTOPHER POWERS**

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    SUMMONS

American LegalNet, Inc.
www.USCourtForms.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>ROBERT P. MOSIER, Receiver for PRIVATE EQUITY<br>MANAGEMENT GROUP, LLC and PRIVATE EQUITY<br>MANAGEMENT GROUP, INC. | **DEFENDANTS**<br>ANTHONY BUFINSKY; and DOES 1-5, inclusive |

| | |
|---|---|
| **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Nicolas Morgan/ Joshua Briones<br>Ana Tagvoryan<br>DLA Piper LLP (US)<br>1999 Avenue of the Stars, Fourth Floor, Los Angeles, CA 90067<br>Tel. (310) 595-3000 / Fax (310) 595-3300 | **Attorneys** (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** (to be determined at trial)

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
(1) Breach of Fiduciary Duty; (2) Conversion and Conspiracy to Convert; (3) Gross Negligence; (4) Professional Negligence; etc.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☒ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

VIA FAX

| | | |
|---|---|---|
| **FOR OFFICE USE ONLY:** | Case Number: | SACV11-00274 |

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc.
www.FormsWorkflow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ No ☐ Yes

If yes, list case number(s):

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case?  ☐ No ☒ Yes

If yes, list case number(s): CV09-2901 PSG (Ex)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☒ A. Arise from the same or closely related transactions, happenings, or events; or
☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ORANGE | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ORANGE | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ORANGE; LOS ANGELES | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

| X. SIGNATURE OF ATTORNEY (OR PRO PER): | Joshua Briones, Esq. | Date | February 15, 2011 |
|---|---|---|---|

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CIVIL COVER SHEET

American LegalNet, Inc.
www.FormsWorkflow.com